# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE ONTIVEROS SEPULVEDA,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>GERY SWARTHOUT, Warden,<br><br>　　　　Respondent. | Case No.: 1:13-cv-00723-JLT<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS (Doc. 1)<br><br>ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT AND CLOSE FILE<br><br>ORDER DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY |

　　　　In 2010, Petitioner was convicted of attempted murder and other crimes. He was sentenced to an indeterminate sentence of life with the possibility of parole plus four years. In this action, he contends the trial court erred when it refused to suspend the proceedings based upon his incompetency. Because the Court does not find there was a bona fide doubt as to Plaintiff's competency, the petition for writ of habeas corpus is **DENIED**.

## PROCEDURAL HISTORY

　　　　After his convictions in the Kern County Superior Court for attempted murder, assault with a deadly weapon, making criminal threats, inflicting corporal injury on a cohabitant, and misdemeanor resisting arrest, Plaintiff was sentenced to an indeterminate prison term of life with the possibility of parole plus four years (Lodged Document ("LD") 4, p. 2).

　　　　He appealed to the California Court of Appeals, Fifth Appellate District (the "5th DCA"),

which affirmed. (LD 4). Petitioner then filed a petition for review in the California Supreme Court that was denied. (LD 6).

## FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's published/unpublished decision[1]:

In the early morning hours of May 4, 2008, Sepulveda waited with a knife and rope in Graciela S.'s bedroom. When Graciela returned home and entered her bedroom, Sepulveda announced to her that nobody was going to separate them and that he was going to kill her and hang himself.

Sepulveda slashed Graciela's neck with the knife. Graciela grabbed at the knife, broke off part of the blade, and threw it under her bed. Sepulveda cut Graciela's neck again with the remaining part of the blade. He also inflicted a cut to her arm and one near her left eye. As Graciela began to have trouble breathing due to the injuries to her neck, Sepulveda put his hands around her neck and tried to strangle her. He told her not to cry or yell, and they were both going to die together.

Sepulveda eventually moved away from Graciela and said, "look at me, look over here, I'm dying, you are dying, we are going to die together." While Sepulveda was apparently trying to hang himself, Graciela got up, pushed through the door, and pushed her way into her daughters' room. Her daughters woke up and she told them to call the police because Sepulveda had "gone crazy" and tried to kill her. Her older daughter called the police.

Officers, who had already been notified of a verbal disturbance, arrived within minutes and encountered Sepulveda running out the front door of the apartment. He was covered with blood and carrying a number of items, which he dropped as the officers chased him. The items included a rope, a beer can, sandals, and a telephone with the cord attached to it.

After running approximately 300 yards, Sepulveda suddenly turned around and started running toward the officers. One of the officers used a taser to subdue Sepulveda and placed him under arrest.

On May 23, 2008, the district attorney filed an information charging Sepulveda with attempted premeditated murder (§§ 665, 187, subd. (a), 189, count 1); assault with a deadly weapon (§ 245, count 2); criminal threats (§ 422, count 3); inflicting corporal injury on a cohabitant (§ 273.5, subd. (a), count 4); and resisting arrest (§ 148, count 5). With respect to counts 1 through 4, the information alleged Sepulveda personally inflicted great bodily injury (§ 12022.7, subd. (a)). With respect to counts 1, 3, and 4, the information alleged Sepulveda personally used a deadly or dangerous weapon (a knife) (§ 12022, subd. (b)(1)).

As set out in greater detail below, between July 2008 and February 2010, the defense brought three separate motions under section 1368 to suspend criminal proceedings and appoint a doctor to evaluate Sepulveda's competency to stand trial. As a result of the first section 1368 motion, Sepulveda was found incompetent to stand trial and ordered committed to Patton State Hospital in November 2008. He was there for approximately six months before hospital staff determined he was competent to stand trial. The defense brought a second section 1368 motion in September 2009. The court granted the motion and appointed psychologist Eugene Couture to evaluate Sepulveda. Dr. Couture concluded that Sepulveda was competent to stand trial, although Sepulveda's IQ score of 69 placed him in the "Mildly Mentally Retarded Range of

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the 5th DCA.

2

Intellectual Skills." The trial court denied the defense's third section 1368 motion in February 2010.

Sepulveda's jury trial began on April 30, 2010, and the trial court dismissed the great-bodily-injury allegation in count 3. On May 3, 2010, the jury found Sepulveda guilty of all the charges and found the enhancement allegations to be true.

On June 2, 2010, the trial court sentenced Sepulveda to prison for life with the possibility of parole on count 1, and imposed a consecutive one-year term for the knife-use enhancement, plus a three-year term for the great-bodily-injury enhancement. The court imposed a concurrent 90–day jail sentence on count 5 and stayed the terms on the remaining counts under section 654.

(LD 4, pp. 1-2).

## DISCUSSION

I.      Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.     Legal Standard of Review

The Court may not grant a petition for writ of habeas corpus under 28 U.S.C. § 2254(d) unless the petitioner shows that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 131 S.Ct. at 787-788.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500. A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

III.     Review of Petitioner's Claim.

The instant petition itself alleges a single ground for relief, i.e., that the trial court violated Petitioner's right to federal due process when it denied his third motion to suspend trial proceedings due to Petitioner's incompetency.

A. Denial Of Petitioner's Motion To Suspend Proceedings Due To Incompetency.

Petitioner contends that the trial court's denial of this third motion to suspend his trial due to incompetency violated his federal due process right to a fair trial. This contention is without merit.

1. The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

> Sepulveda contends the trial court erred in denying the defense's third section 1368 motion for a competency hearing. We disagree and conclude the court did not abuse its discretion in denying the motion because the defense did not present a substantial change of circumstances or new evidence casting a serious doubt on the validity of the previous finding of competency.
>
> **A. Background**
>
> On July 15, 2008, the trial court granted the defense motion to suspend criminal proceedings under section 1368 and appointed a psychologist, Dr. Ross Kremsdorf, to examine Sepulveda. Dr. Kremsdorf submitted a written report in which he concluded that Sepulveda was incompetent to stand trial due to cognitive deficits suggesting "the likelihood of a developmental disability." According to Dr. Kremsdorf, Sepulveda appeared "to be performing within the 'Mentally Retarded' range of intellectual functioning." As a result, he recommended that Sepulveda be evaluated "by the Kern Regional Center for the presence of a developmental disability."
>
> Dr. Kremsdorf also noted that Sepulveda reported "he does periodically experience auditory and visual hallucinations" but added his "report was vague and without details." Dr. Kremsdorf concluded that Sepulveda's impaired ability to relate to counsel and his difficulty understanding courtroom proceedings "did not appear to be the result of psychotic or depressive symptoms." (Italics added.)
>
> On September 30, 2008, after receiving Dr. Kremsdorf's report, the trial court found Sepulveda incompetent to stand trial and referred him to the county mental health department for evaluation. Based on the department's subsequent recommendation, the court ordered Sepulveda committed to Patton State Hospital on November 10, 2008.
>
> On June 17, 2009, the hospital's medical director filed a certificate of competency, certifying that Sepulveda was competent to stand trial. (§ 1372.) The accompanying report, dated May 13,

2009, reflected that Sepulveda had been given a primary diagnosis of adjustment disorder and depressed mood, explaining:

> "Records show that he periodically experienced auditory and visual hallucinations although his report was vague, inconsistent, and without details. Documentation of Mr. Sepulveda's depressed mood were much more complete which included feeling sad and crying and having difficulty with insomnia. The major stressor that Mr. Sepulveda encountered which triggered this depressive episode which was self limited was his arrest for the alleged charges. Mr. Sepulveda reported that he was depressed. There was an M–FAST administered, which the individual scored an 18/26 suggesting exaggeration of psychiatric symptoms. At the time of admission to the hospital, the individual complained of poor sleep and a voice intermittently calling his name at night, not more than weeks. It was not notably present during the day, nor did it reportedly interfere with his daily activities. As a voice that simply calls one[']s name is insufficient for a diagnosis of schizophrenia, schizoaffective disorder, schizophreniform disorder, and even brief reactive psychosis it was felt that a psychotic disorder diagnosis was unwarranted. Since, it was very clear that he suffered a marked stressor, and had some symptoms of depression, it was felt that his symptoms were better accounted for by a diagnosis of Adjustment Disorder with Depressed Mood. [¶] Mr. Sepulveda has a long history of alcohol abuse and at least one arrest for being under the influence." (Italics added.)

The report also addressed the status of the symptoms contributing to the initial finding of incompetency:

> "Mr. Sepulveda is not psychotic. Mr. Sepulveda is [well] oriented to person and place. He denies depression, as well as insomnia. He does not exhibit any signs or symptoms of depression. In fact, he is often seen smiling appropriately and interacting with peers. He denies any and all symptoms of psychosis. He does not take any psychiatric medication. Mr. Sepulveda does complain that he has difficulty learning due to the fact that he is illiterate, but treatment groups consist primarily of discussion, and he has learned the required court material at a relatively rapid pace. His general level of functioning on the unit, including his ability to relate to peers, negotiate his needs, and remember and follow the routines and rules of the unit does not indicate intellectual deficits. It is currently believed that while in jail he was suffering from extreme stress due to his legal situation and became frightened, which resulted in him saying very little and gave the appearance of his suffering from intellectual deficits." (Italics added.)

Regarding Sepulveda's ability to rationally cooperate with an attorney, the report stated:

> "Mr. Sepulveda knows the charges against him and their seriousness. He is able to discuss what the police reports indicate. He says that he trusts his attorney. He says that he wants to resolve his legal issues and is willing to discuss his charges with his attorney and to work with his attorney to develop a viable plan of defense. It is the opinion of the treatment team that Mr. Sepulveda is able to cooperate with his attorney in his own defense."

The report also addressed Sepulveda's knowledge and understanding of the charges and legal procedure:

> "Mr. Sepulveda meets the criteria of understanding the basic court knowledge and procedures. He knows and understands the charges against him, the possible sentences, and evidence against him. He was able to explain what the meaning of the four pleas and the plea bargaining process. He understands that in order to accept a plea bargain, he must plead guilty. He knows the roles of court personnel. It is, therefore, the opinion of the treatment team that ... Mr. Sepulveda meets the criteria for competency. The court

should be aware, however, that Mr. Sepulveda is very unsophisticated and requires that discussions be conducted using a simplistic Spanish vocabulary."

Based on the hospital report, on July 1, 2009, the trial court found Sepulveda competent to stand trial and reinstated criminal proceedings.

On September 18, 2009, the trial court granted a second section 1368 motion and appointed Dr. Couture to evaluate Sepulveda. Dr. Couture submitted a 12–page report, dated October 1, 2009, in which he concluded Sepulveda was competent to stand trial. The report noted Sepulveda's performance on a test of his intellectual skills "indicated an IQ score of 69, which fell in the Mildly Mentally Retarded Range of Intellectual Skills," and observed that "[t]his performance is consistent with his performance on other measures in the past, which measured his intellectual skills and suggested that he has mild mental retardation." Sepulveda's performance on the "Georgia Court Competency Test–Revised (GCCT–R)" indicated a score of 78, "which fell in the Competent to Stand Trial Range." The report explained that "[a] minimal score of 70/100 is required for an inmate to be considered as competent in passing this measure."

Dr. Couture's report also addressed Sepulveda's claims that he experienced auditory hallucinations:

> "Mr. Sepulveda reported auditory hallucinations that started when he was 28 years old, while living in Mexico. He reported that he used to hear a male voice that told him derogatory things and stated 'I heard him say "kill him."' He denied that he was drunk when hallucinating. He reported infrequent experiences of auditory hallucinations now, also hearing a male chatter, but cannot make out what is being said. He stated that this does not frighten him. He denied any other source of hallucinatory experiences. His thinking appeared goal oriented and free from delusional ideas. Mr. Sepulveda's thinking, however, was concrete and he did not discuss a goal oriented plan for his future."

On October 13, 2009, the trial court found Sepulveda competent to stand trial and reinstated criminal proceedings.

At a readiness hearing on February 9, 2010, defense counsel notified the court he was having "some communication issues" with Sepulveda and was "trying to figure out whether he's actually competent." The following discussion ensued:

> "[DEFENSE COUNSEL]: Your Honor, I've been speaking to Mr. Sepulveda for about half an hour with the interpreter. [¶] Mr. Sepulveda indicated that he's hearing voices and he could not explain the court process to me after I repeatedly asked him. [¶] I have some doubts as to his competency, and I'd ask for a 1368 evaluation. [¶] ... [¶]
>
> "[THE PROSECUTOR]: Your Honor, this will be the third 1368.[¶] While I empathize with [defense counsel's] position, we end up back in the same position every single time. 1368'd, he does get brought back, [defense counsel] has difficulty going over the case with his client. [¶] At this point, I'm not really sure what appropriate remedy is. It just seems we keep coming back and doing the same thing. [¶] ... [¶]
>
> "... I think one of the fundamental problems we're going to keep coming back to in this case from the previous 1368 evaluations is that the defendant has a low functioning IQ level and that, in combination with some other factors—I watched [defense counsel] try to work with his client repeatedly. In no way am I trying to disparage [defense counsel's] efforts in this matter, I just—
>
> "[DEFENSE COUNSEL]: Your Honor, for the record, my concern is ... Mr. Sepulveda's mental retardation. I feel very uncomfortable asking someone with his thought process

7

to make a decision that's going to potentially affect the rest of his life without being sure that he understands what's going on. [¶] I don't want to rush through a court process with very little understanding of choices and decisions that he has to make.

"THE COURT: [Defense counsel], it appears that Doctor Couture was appointed to examine Mr. Sepulveda on September 22nd and that Doctor Couture returned a report on October 13th where Mr. Sepulveda was determined to be competent. [¶] ... [¶]

"In reviewing the report of Doctor George Christianson as to the May 13th, 2009, return, they indicated that—once again, that he had been restored to competency and should be returned to court to stand trial. [¶] It appears from Doctor Couture's report that Mr. Sepulveda as of October 1 was competent. [Reading from Dr. Couture's report:] 'It should be noted that he is mentally slow, not very sophisticated.' [¶] 'He understands the nature and purpose of the proceedings against him.' [¶] 'It is important that items be explained in simple terms and be repeated in order for his defense team to ascertain that he understood the concept he agrees to.' [¶] 'He does not have a psychiatric disorder at this time which would interfere with his ability to reason and rationally address his case with his attorney.'

"[Defense counsel], has there been anything in addition to what Doctor Couture reviewed in October or is this a continuation of the same situation?

"[DEFENSE COUNSEL]: Well, I did ask Mr. Sepulveda if he's hearing voices. I know that in his prior evaluation when he was in Patton he also indicated he heard voices. He was treated with medication, stopped hearing them. [¶] He's currently having some auditory hallucinations at this point. [¶] I understand what Doctor Couture's report indicates and, as an offer, I did retain Doctor Couture as a consultant to talk about his case and his findings. [¶] I understand that he—one of his assistants visited my client recently to make additional findings. [¶] I've called and I've e-mailed Doctor Couture with no success. He hasn't returned any of my e-mails. [¶] On CJIS it shows that his assistant visited Mr. Sepulveda on January 21st. [¶] I understand the findings of Doctor Couture, but I also understand that a year before those findings were made, Doctor Kremsdorf indicated Mr. Sepulveda was not able to consult with counsel, was not able to rationally make decisions, and my understanding of mental health is that it doesn't clear up in one year. [¶] There's—malingering is ruled out. Doesn't indicate Mr. Sepulveda has ever malingered. [¶] I don't believe his condition cleared up, and I don't believe he regained alertness and focus in one year and [somehow] his mental condition improved. [¶] I think he's still the same person he was in 2008 with the initial finding he's mentally ill. I think he's not competent to stand trial. [¶] I think the problem with Doctor Couture's findings is that I can go over a certain pattern of facts again and again with Mr. Sepulveda to the point he starts parroting them, mimicking them. [¶] Not a true understanding or ability to consult with counsel. Basically trying to tell me what he thinks I want to hear.

"THE COURT: [Defense counsel], if that is the issue as to Doctor Couture, what was the issue as to the California Department of Mental Health and their return from Patton State Hospital?

"[DEFENSE COUNSEL]: You know, I'm not sure how Patton State Hospital returns people to competency. [¶] But from all the literature and findings that I've examined about mental health, mental health people don't get restored to competence after a month unless Patton State Hospital is the Number 1 mental health clinic in America who can do amazing things that no other mental health facility can do either public or private. [¶] I just don't believe that a person can be returned to competency with whatever treatment they get in less than a month. [¶] I think Mr. Sepulveda has competency issues. I feel

8

uncomfortable having him go to trial facing a life sentence where he has only marginal or minute understanding of what that means.

"THE COURT: Counsel, my concern is that on July 1st, 2009, while represented by counsel, the matter was submitted to the court on the reports and return from Patton State Hospital, and it was determined at that time that Mr. Sepulveda had regained competency. [¶] Then on August the 14th, [defense counsel], you raised the issue as to his competency once again and Doctor Couture was appointed. [¶] Then on October the 1st, Doctor Couture's opinion is consistent with the opinion from Patton State Hospital and mental health. [¶] At this point without some change of circumstances or additional information, I will deny the motion to suspend criminal proceedings pursuant to Penal Code Section 1368.... [¶] ... [¶]

"The matter as to the motion to suspend criminal proceedings pursuant to 1368 is denied without prejudice in the event that the defense may be able to present to the court additional information that may have been adduced from Doctor Couture's review from January of this year. [¶] [Defense counsel], if you have change of circumstances or something to indicate that there is something different than what has been previously indicated, reviewed, and determined to be competent, please present that to the court and the court would consider that in regards to the issue as to competency."

**B. Applicable legal principles**

A criminal defendant is mentally incompetent to stand trial if, "as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) A defendant is mentally competent to waive the right to counsel if he is mentally competent to stand trial. (Godinez v. Moran (1993) 509 U.S. 389, 397, 398, 399; People v. Welch (1999) 20 Cal.4th 701, 740–741; People v. Hightower (1996) 41 Cal.App.4th 1108, 1115.) The trial court is required to conduct a competency hearing if defense counsel informs the court that he or she believes the defendant may be mentally incompetent. (§ 1368, subd. (b).) The court also must conduct a competency hearing on its own motion if there is evidence that raises a reasonable doubt on the issue. (People v. Howard (1992) 1 Cal.4th 1132, 1163.)

Once a competency hearing has been held, however, the court is not obligated to conduct a second competency hearing unless "it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of" its finding of competence after the first hearing. (People v. Jones (1991) 53 Cal.3d 1115, 1153.) This is a high hurdle: "[O]nce a defendant has been found to be competent, even bizarre statements and actions are not enough to require a further inquiry." (People v. Marks (2003) 31 Cal.4th 197, 220.) In applying these standards, we bear in mind that "[r]eviewing courts give great deference to a trial courts decision whether to hold a competency hearing." (Ibid.)

**C. Analysis**

Sepulveda contends the information offered by defense counsel at the hearing on February 9, 2010—Sepulveda's report of hearing voices and counsel's belief that Sepulveda lacked "a true understanding or ability to consult with counsel" due to his mental retardation-presented the trial court with a substantial change of circumstances requiring the court to hold a third competency hearing. However, neither Sepulveda's claim of hearing voices nor his intellectual deficits were new circumstances. The record shows Sepulveda had been claiming to hear voices from the time of the first competency hearing, and his claim had been addressed in all the reports submitted to the trial court. None of the doctors who evaluated Sepulveda, including Dr. Kremsdorf, who gave the initial opinion of incompetency, found that Sepulveda's self-reported psychotic symptoms, including hearing voices, affected his competency to stand trial. Defense

>counsel did not offer any information or evidence at the February 9 hearing indicating Sepulveda's current claim of hearing voices was substantially different than his previous claim, such as would indicate a recent deterioration of Sepulveda's mental state, as he suggests on appeal.
>
>Similarly, defense counsel offered no evidence, only his subjective impressions, to contradict the previous evaluations by Dr. Couture and Patton State Hospital staff concluding that Sepulveda was competent to stand trial in spite of his low IQ score and mild mental retardation. Because the trial court was not presented with a substantial change of circumstances or new evidence casting a serious doubt on the validity of the previous competency findings, the trial court did not abuse its discretion in denying the defense's third section 1368 motion.
>
>In addition to claiming the trial court erred in failing to hold a third competency hearing, Sepulveda also claims he was denied substantive due process because he was tried and convicted when he was actually incompetent to stand trial. The record does not support this claim. The trial court's findings of competency were amply supported by the uncontradicted evaluations submitted by Patton State Hospital and Dr. Couture. Although defense counsel disagreed with the experts' conclusions of competency, he did not subsequently present any evidence to refute them, despite the court's express invitation to do so, when it denied the third section 1368 motion without prejudice.
>
>Sepulveda's reliance on Dr. Kremsdorf's initial opinion of incompetency is also unpersuasive. The factors contributing to the psychologist's opinion were specifically addressed in the Patton State Hospital report. The defense did not dispute the report's conclusion that Sepulveda's initial appearance of incompetency was partly due to the "extreme stress" he was suffering as a result of his incarceration and that, through the programs administered by the hospital, Sepulveda had "learned the required court material at a relatively rapid pace" and had been restored to competency. Sepulveda has not demonstrated a deprivation of due process.

(LD 4, pp. 2-6).

        2.   <u>Federal Standard</u>.

The conviction of a legally incompetent defendant violates due process. <u>Cooper v. Oklahoma</u>, 517 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). Federal courts have recognized two distinct aspects to competency claims: (1) a procedural due process claim that may arise where a state court has failed to hold a competency hearing where there was a "bona fide doubt" about the petitioner's competence; and (2) a substantive due process claim, where a petitioner was tried and convicted or sentenced while he was in fact, or "actually," incompetent. <u>See, e.g., Davis v. Woodford</u>, 384 F.3d 628, 644 (9th Cir.2004); <u>Williams v. Woodford</u>, 384 F.3d 567, 603–04, 608 (9th Cir.2004).

For a procedural due process claim regarding the denial of a competency hearing, the Ninth Circuit has opined that, under the AEDPA, it is clearly established Supreme Court precedent that a trial court must sua sponte conduct a competency hearing whenever evidence before the trial court raises a "bona fide doubt" about the defendant's mental competency. <u>See Stanley v. Cullen</u>, 633 F.3d 852, 860 (9th Cir.2011) (citing <u>Maxwell v. Roe</u>, 606 F.3d 561, 568 (9th Cir.2010)). A "bona fide doubt" exists

where "a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced a doubt with respect to competency to stand trial." Maxwell, 606 F.3d at 568 (citation omitted). "A defendant must show that there was 'substantial evidence' that he was mentally incompetent to stand trial." Davis v. Woodford, 384 F.3d at 644 (quoting Moore v. United States, 464 F.2d 663, 666 (9th Cir.1972)).

Furthermore, the responsibility to assess a defendant's competency continues throughout trial, and the same "bona fide" standard applies to determine whether additional competency hearings may be required. Maxwell, 606 F.3d at 568 (citations omitted).[2] The federal habeas court reviewing such a procedural due process claim may only consider the evidence that was before the trial judge. Williams v. Woodford, 384 F.3d at 604; United States v. Lewis, 991 F.2d 524, 527 (9th Cir.1993). The "inquiry is not whether the trial court could have found the defendant either competent or incompetent, nor whether the reviewing court would find the defendant incompetent." United States v. Mitchell, 502 F.3d 931, 986 (9th Cir.2007). Rather, in reviewing whether a "bona fide doubt" existed, and whether the state trial court's failure to sua sponte institute competency proceedings therefore violated a petitioner's right to procedural due process, the reviewing habeas court considers "whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." Stanley v. Cullen, 633 F.3d at 860 (citation omitted).

A defendant is considered competent for constitutional purposes where he has a rational and factual understanding of the nature and object of the proceedings against him, has the ability to consult with his lawyer, and has the ability to assist in preparing his defense. Drope v. Missouri, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). Although no particular facts necessarily signal a defendant's incompetence, "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required," and "one of these factors standing alone may, in some circumstances, be sufficient." Drope,

---

[2] Various cases have used the terms "sufficient doubt," "good faith doubt," "genuine doubt," "reasonable doubt" and "substantial doubt" as to a defendant's competence to stand trial, but the Ninth Circuit has indicated that all of these terms "describe the same constitutional standard." Chavez v. United States, 656 F.2d 512, 516 n. 1 (9th Cir. 1981). The Ninth Circuit has also used the phrase "bona fide doubt" in applying Pate and Drope. See, e.g., U.S. v. White, 670 F.3d 1077, 1082 (9th Cir.2012); Maxwell v. Roe, 606 F.3d 561, 568 (9th Cir.2010); Moran v. Godinez, 57 F.3d 690, 695 (9th Cir.1994).

420 U.S. at 180.  In addition, a state trial or appellate court's finding that no competency hearing was required is a factual determination entitled to deference unless it is unreasonable within the meaning of § 2254(d)(2). Mendez v. Knowles, 556 F.3d 757, 771 (9th Cir.2009); Davis, 384 F.3d at 644.

On the other hand, to prevail on a substantive due process claim that a defendant was "actually" incompetent during trial, the defendant must show that "at the time of trial he lacked either sufficient ability to consult with his lawyer with a reasonable degree of rational understanding, or a rational and factual understanding of the proceedings against him." See Williams v. Woodford, 384 F.3d at 608 (citing Dusky v. United States, 362 U.S. 402, 402 (1960)). Furthermore, in considering a substantive due process claim that defendant was not actually competent, a reviewing court may consider facts and evidence that were not before the state trial court. See id.  Thus, a review of a substantive due process claim essentially requires the Court to consider what quantum of proof is permissible "'[o]nce a State provides a defendant access to procedures for making a competency evaluation[.]'"  Cooper, 517 U.S. at 355, 364 (quoting Medina, 505 U.S. at 449).  Medina and Cooper would thus be the "clearly established Federal Law" controlling this case to the extent that Petitioner's claim can be understood as raising a substantive due process issue, i.e., a competency hearing has been held and the one claiming incompetence challenges the quantum of proof he was required to meet there.

The state court's factual findings, however, are subject to deference in these proceedings.  See Davis v. Woodford, 384 F.3d 628, 644 (9th Cir.2003) (stating it would defer to the state courts' decisions not to order a competency hearing "unless they are 'unreasonable' within the meaning of 28 U.S.C. § 2254(d)(2)"); Waller v. Wofford,  2012 WL 5870762 at *3 (C.D.Cal. Nov.19, 2012).  When a habeas petitioner alleges a state court made a unreasonable determination of fact under § 2254(d)(2), the federal habeas court "must be particularly deferential to [its] state-court colleagues" on their determinations of fact. Taylor v. Maddox, 366 F.3d 992, 999–1000 (9th Cir. 2004). The federal district court "may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." Id. at 999.

"Challenges under § 2254(d)(2) fall into two main categories. First, a petitioner may challenge the substance of the state court's findings and attempt to show that those findings were not supported by substantial evidence in the state court record. Second, a petitioner may challenge the fact-finding

12

process itself on the ground that it was deficient in some material way." Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir.2012) (relying on Taylor, 366 F.3d at 999–1001). The Hibbler panel discussed some of the permutations of the latter category, in which "the fact-finding process itself was deficient in some material way ." The court noted that

> [i]n some limited circumstances, we have held that the state court's failure to hold an evidentiary hearing may render its fact-finding process unreasonable under § 2254(d)(2).... A state court's decision not to hold an evidentiary hearing does not render its fact-finding process unreasonable so long as the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question.

Id. at 1147 (citations omitted).

   3. Analysis.

    a. Procedural Due Process.

  To the extent that Petitioner is contending that the state court erred in failing to find a "bona fide doubt" as to his competence before denying Petitioner's third request for a competency hearing, he is mistaken. As Respondent correctly points out, no evidence was ever presented at the request for a third competency hearing that a significant change in Petitioner's circumstances had occurred following the conclusion of the second competency hearing. (Doc. 14, p. 22). At the time Petitioner requested the third hearing, his competency had already been established by two authorities, Dr. Couture and the state hospital, approximately four months earlier. Moreover, defense counsel's basis for requesting a third hearing was that Petitioner was hearing voices and that he appeared to counsel to be mentally slow. However, neither of these factors were new; to the contrary, both had previously been addressed at the second competency hearing at which Petitioner was found competent to stand trial.

  It appears undisputed from the record that Petitioner has a low I.Q. and counsel would have to speak to him in basic Spanish, with a great deal of patience and understanding. The test results indicate that, while Petitioner may have been at the lower end of the spectrum of competent defendants, he was, nevertheless, competent. The fact that communicating with him was difficult for counsel does not, by itself, mandate either another competency hearing or an outright declaration of incompetence. Under applicable precedent, absent any significant change in Petitioner's mental circumstances in the four months between the second hearing and the motion for a third hearing, the trial court had no basis on which to order the third competency hearing because the record did not raise a bona fide question

regarding Petitioner's competence at that time. Maxwell, 606 F.3d at 568; Hibbler, 693 F.3d at 1147.

b. Substantive Due Process.

Similarly, to the extent that Petitioner is contending that, pursuant to § 2254, the state court findings were unsupported by the evidence or that the fact-finding process itself was fundamentally flawed, the contentions lack merit.

First, Petitioner raises no claim that the process itself was defective. Second, the evidence was sufficient to support the findings of the two experts, i.e., Dr. Couture and the state hospital, that Petitioner was competent. The experts noted that Petitioner was able to consult in a rational manner with his counsel, to understand the charges against him and the court's procedures, and that Petitioner exhibited thinking that was goal-oriented and free from delusional ideas. (LD 4, pp. 3-4). Petitioner, for his part, presented no evidence to rebut the prosecution's evidence. Moreover, the trial court was in a position to observe and assess Petitioner's behavior and to communicate with him during the course of pre-trial and trial proceedings, and would have been in a position to observe any visible or discernable changes in his mental state. See Moran v. Godinez, 57 F.3d 690, 695 (9th Cir. 1995).

In his Traverse, Petitioner argues that the original finding of incompetence at the first hearing should have been given weight by the judge and that the judge "deprecated" defense counsel's opinions by calling them "subjective impressions," despite the fact that defense counsel was in the best position to have an informed view of Petitioner's mental state. (Doc. 27, p. 8). Petitioner's arguments notwithstanding, the record does not indicate that the trial court disparaged counsel's subjective views of Petitioner's mental state, but only that such lay views were insufficient to raise a bona fide doubt regarding Petitioner's competency in light of prior conclusions by mental health experts. Moreover, the views of the first expert, Dr. Kremsdorf, who had found Petitioner incompetent in a report dated September 9, 2008, were part of the evidence in the case of which the trial court was already aware and, presumably, which the trial court considered in denying the defense motion for a third competency hearing. The fact that the trial court did not expressly note Dr. Kremsdorf's findings is not surprising since a significant improvement in Petitioner's mental state had occurred after being assessed by Dr. Kremsdorf and following his confinement for treatment, improvements that resulted in the October 9, 2009 findings by both Dr. Couture and the state hospital that Petitioner was then competent.

Given that the most recent medical expert testimony regarding Petitioner's competency was uncontroverted and that Petitioner presented no evidence of his incompetence other than his counsel's lay misgivings and concerns, this Court cannot conclude that the state court's findings of fact were not only wrong, but unreasonable. Taylor v. Maddox, 366 F.3d at 999. Accordingly, the state court's adjudication and its fact-finding were not objectively unreasonable. Under those circumstances, Petitioner's claim must be rejected.

Moreover, the Court declines to issue a certificate of appealability. A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-336 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
> > (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
> >
> > (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denied a petitioner's petition, the court may only issue a certificate of appealability when a petitioner makes a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To make a substantial showing, the petitioner must establish that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further'."

Slack v. McDaniel, 529 U.S. 473, 484 (2000) (*quoting* Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

In the present case, the Court finds that Petitioner has not made the required substantial showing of the denial of a constitutional right to justify the issuance of a certificate of appealability. Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Thus, the Court DECLINES to issue a certificate of appealability.

## **ORDER**

For the foregoing reasons, the Court **ORDERS**:

1. The petition for writ of habeas corpus (Doc. 1), is **DENIED**;
2. The Clerk of the Court is DIRECTED to enter judgment and close the file;
3. The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   **September 22, 2015**              **/s/ Jennifer L. Thurston**
                                                             UNITED STATES MAGISTRATE JUDGE